VICENTE ZAYAS PIZARRO, Plaintiff and Appellant, *v.* HEIRS OF CAYETANO DALECCIO VITA ET AL., Defendants and Appellees.

No. 10572. Submitted June 30, 1957.—Decided November 22, 1957.

160

*Vicente Zayas Pizarro, pro se,* and *R. Hernández Matos* for appellant. *Carlos E. Colón* for appellees.

Mr. Justice Belaval delivered the opinion of the Court.

ON RECONSIDERATION

This is a declaration of servitude of right of way in favor of a tenement crossed by a public road, but which, according to plaintiff-appellant, is unsafe, impracticable, and insufficient for the needs of the tenement. The trial court made, among others, the following findings of fact:

"That there is a road which runs through defendants' property *up to the point where it abuts on plaintiff's property at a small house,* and continues in a northerly (should read easterly) direction *alongside plaintiff's property* [finding A]; that the road is 290 meters long and 3 meters and 60 centimeters wide, having a ditch 20 inches wide at some places, 3 meters and 75 centimeters at others, and still at other places 5 meters and 70 centimeters, and sometimes 4 meters and 10 centimeters, so that its course is irregular on account of the curves and the shrubbery in certain sections of the road alongside the mountain [finding B]; that although the road is steep and unpaved, it *can be enlarged and improved* [finding C]; that, despite its actual condition, heavy-motor vehicles, loaded or unloaded, may travel on the road [finding D]; that plaintiff's tenement extends from the point where it abuts on the road in question, *in a southwesterly direction, where the deposits of stone* for construction and other purposes *are located* [finding G]; that on plaintiff's property and in the

direction of the stone deposits the land is broken, rocky, and ravined [finding I]; *that there are no roads on plaintiff's property, properly speaking,* but only lanes, footpaths, and horse trails [finding J]; that according to the testimony of plaintiff himself, Vicente Zayas Pizarro, there is no passage leading to the road which runs alongside his property and abuts on the highway, and that the cost of construction would be too onerous and excessive, *but that it could be constructed,* although at a great expense, as proved by the rest of the evidence [finding M]; *that the existing road needs repairs* and can be repaired [finding O]; that it would be advisable *to enlarge the road* paving it with stone or asphalt, and with the proper conservation the damaging effect of rain could be prevented [finding P]; that, despite its actual condition, the road is safe for travel, *taking, of course, the precautions required on rough land and a narrow road* [finding Q]; that since the *existing road which joins the insular Naranjo highway to plaintiff's property* can be improved and repaired, and since a road connecting the stone deposits with the road that leads from plaintiff's property to the highway can be built, *even though at an excessive cost—* as it appears from the rest of the evidence—the right of way prayed for should not be granted [finding R]; that even though it would be *very costly and onerous for plaintiff* to construct a road *which would join the existing road* to the stone deposits, such road would run through plaintiff's property [finding S]; that according to the testimony of witnesses, the construction of a road starting at the stone deposits and ending at the road which joins plaintiff's property to the insular highway *would be a very costly project* but not impossible within existing construction technique."

The findings of the trial court would be complete if the court would have also found that the cost of repairing the existing public road extending from the insular highway to the southeastern part of plaintiff's tenement, where the house is located, would also be too costly for the plaintiff-appellant, according to the testimony of the expert, Mr. Giles, who also testified that it would be necessary to make another alignment so as to avoid the two inclined slopes on that road which have a 20 percent grade (a grade of 20 meters per 100 meters),

162

the other two experts having testified that the grade is 16 or 17 per cent and that the maximum normal inclination is 7 percent.

An approximate graphic illustration of the facts found proved would be the following:

It is well to note that, as to the existing public road, the trial court does not conclude, clearly and specifically, that the dirt road is practical and safe, as required by law and the case law applicable to the case, but it determines a certain degree of accessibility, "taking, of course, the precautions required on rough land and a narrow road" which can be

repaired to meet the needs of the tenement. This has compelled us to make, on our part, an elaborate study of the evidence introduced in order to determine the true scope and proper meaning of that finding. Dispensing with that part of the testimony where the elements which actually establish the facts as well as the elements of credibility may be in conflict, and contrasting the conflicting points with the more unbiased statements of the scientific proof had before the trial court, such as the topographic map of the region and the profile of the public highway on which the dirt road abuts, which were drawn up by the engineers of the former Department of the Interior, and also the survey plans of the two properties in question which were prepared by two independent surveyors for other purposes not connected with this suit, we feel constrained to interpret that finding in the sense that the trial court concluded, as a matter of fact, that although the existing road bordering the southeastern part of plaintiff-appellant's property has a certain degree of accessibility which allows the occasional traffic of heavy-motor vehicles, yet, in order to render that road practical and safe and sufficient for the needs of the tenement, it would need certain repairs such as clearing, enlargement, or paving, for which the plaintiff-appellant must pay. Let us see.

The first witness called by the plaintiff-appellant was civil engineer Giles, who testified on the actual condition of the existing public road as follows: "like all dirt roads which run through mountains and which are formed by the action of traffic and precisely of rain, and perhaps by shovel and pickaxe, it is a very steep road" (Giles, Tr. 37–38); "a dirt road, very steep, a poor and inconvenient surface .... I mean to say that the road is not fit for the traffic of vehicles, except ox carts, and perhaps a jeep might go up with difficulty, I don't know, when it is dry perhaps but I doubt if it could make it in rainy weather" (Giles, Tr. 49–50); "the width of 4 to 5 meters is not very accurate; it is fenced on both sides"...
"more plainly, in several sections the road is sort of a ditch:

I mean that as a result of the traffic a ditch has been made alongside the fence all the way up; and there is a slope and the road, that is, the road grade is at some places 3 or 4 feet lower than the sides" (Giles, Tr. 50–51); "I drove up in a Ford car all the way to the end of the road," and from there on "I walked"; the distance from the end of the road to plaintiff-appellant's property would be "approximately 300 meters" . . . "there are two short stretches with a grade of about 20 per cent" . . . If I had to drive a truck along that road in order to exploit a marble or stone quarry . . . "I would quit" . . . "because I do not want to travel along that road . . . because the grade is steep, too steep, and it would be dangerous" . . . "it is not safe" . . . "I do not believe it would be practical" (Giles, Tr. 51–54); on reaching plaintiff-appellant's property the land on the left (southeast) begins to rise; "the road is located more or less at the highest point of the ridge which keeps rising" (Giles, Tr. 56); as to the servitude requested, "at the roadhead starts a dirt road with no grade which is almost at the same level, and one could reach the middle point of the southern boundary" . . . "a roadway which on the boundary line is exactly at the same level as the roadhead" . . . (Giles, Tr. 58); if a road were constructed within the property extending from the house (southeastern point) to the southwestern point (where the mouth of the quarry is located), it would be "too steep" . . . "alongside the boundary . . . near the southern part the grade would be quite steep" . . . the flattest area is "the southwestern corner" (Giles, Tr. 67–69); in order to improve the existing public road, "if I were in charge of building a road to reach the property, I would make a new layout, precisely on that stretch of about 300 meters, to improve it" . . . "on that same place . . . it can be done if there were enough money to spend, but it would be very costly" . . . the exploitation of "either that farm or any other" would not be justified (Tr. 73–74); "I have said that perhaps a jeep can go up the road on many occasions . . . but I would never dare drive a car up that road"

(Giles, Tr. 85) ; "the road ascends gradually from a lower to a higher altitude" . . . "in order to make it feasible," as if it were a public road . . . it would be quite expensive . . . to make it feasible as those of Central Merceditas where there is enough room for two big trucks, well loaded, "it would be very expensive and a detour would be necessary in order to decrease the grades" . . . the present layout is "very costly" . . . to make it trafficable in normal weather, what we call "odd weather" . . . to make it trafficable *as a mere dirt road*, "it would not be very costly, it is trafficable now, *but not by vehicles*" . . . even assuming that the road were paved . . . "it would be very hazardous" . . . "it is neither practicable nor safe." (Giles, Tr. 85–89.)

The second witness called by the plaintiff-appellant was civil engineer Nazario, who testified as to the present condition of the existing public road as follows: From the end of the Naranjo road (the highway) up to the small house on Zayas Pizarro's property there is "a horse trail of loose stone, with no ditch, of some gravel and also loose stone" . . . "it is about 4 meters" wide . . . "from fence to fence," "wired on both sides" . . . with "rather steep grades" (Nazario, Tr. 140) ; if a road were built on Zayas Pizarro's property (southeast) starting at the house and leading to the place where the stone deposits (southwest) are located, such road could not be used to transport the stone . . . "because the slope is too steep . . . the place is too steep" . . . it would cost very much to build a road through Zayas Pizarro's property . . . besides . . . "within the existing road"; trucks can go up, "but they can go up once or twice, but it is not advisable to drive a truck up the road four or five times" . . . a road could be built from the house to the quarry . . . "it could be done there, but I think it is too expensive because it is rock, it is too hard." (Nazario, Tr. 169–70.)

The third witness called by the plaintiff-appellant was Donato Zayas Pizarro, who testified as to the present condition of the existing public road as follows: "I believe that

about 90 percent of the property is rock" (Donato Zayas Pizarro, Tr. 172) . . . the land is rather broken and the southern and eastern sides are bordered by Las Cuevas road . . . the distance from the end of the Naranjo highway to Zayas Pizarro's property, where the house is located (southeastern point), is "about one third of a kilometer" . . . 300 meters (Donato Zayas Pizarro, Tr. 173–74); "a dirt road more or less the same width as all dirt roads in Puerto Rico, that is, 3 or 3½ meters wide, at some places it is as much as 4 meters" . . . "it is not paved, it is a dirt road with no ditches"; its slope is rather "steep" . . . "it would be impossible for a truck carrying 4 cubic meters of stone to ride uphill in the present condition of the road" . . . "it might go up once, but the second time the brakes would burn or some trouble might develop" (Donato Zayas Pizarro, Tr. 174) . . . "the best place is the lower section of the farm" . . . "on the west and southwest" . . . the stone could not be transported from the southwestern side to the house (southeast) and from there to the existing road because "it would be necessary to build a very expensive road, and then maybe the trucks won't be able to go uphill." (Donato Zayas Pizarro, Tr. 175.)

The fourth witness called by the plaintiff-appellant was Juan Pibernus, who testified as to the present condition of the existing public road as follows: *Assuming* that there is a quarry on the eastern side of Zayas Pizarro's property, that is, near the quarry, I do not think that the trucks loaded with stone could come downhill . . . unless the road were paved . . . because "the uphill grade is too steep, so steep that it is dangerous to drive a loaded car, as it might turn over" (Pibernus, Tr. 200) . . . the road is susceptible of repairs provided "it is made wide enough and *the slope is reduced*" . . . "only as far as the house, but from there on it has no access to the quarry."

The fifth witness was plaintiff-appellant himself, Vicente Zayas Pizarro, who testified as to the present condition of the existing public road as follows: "I refer to the road where

the Naranjo highway ends, and which is paved, and runs as far as the house located on my farm, on the southeast corner" . . . *"which road I have used to visit the farm;* the only truck gardening gathered amounts to a few pounds of pigeon peas" (Vicente Zayas Pizarro, Tr. 254–55) ; the road does not reach into the interior of the property "at any point; when I was going to build the house there was some argument that a small planted parcel was not mine and a line was drawn which runs alongside the dirt road leading to Las Cuevas" . . . (Vicente Zayas Pizarro, Tr. 270) . . . the road does not cross the farm, "it continues making zigzags; at a distance there is a wire fence which I installed myself." (Vicente Zayas Pizarro, Tr. 279–80.)

The sixth witness called by defendants and appellees was José Dolores Santiago, who testified as to the present condition of the existing public road as follows: Part of Las Cuevas road "extends as far as the paved junction, *and then it turns into a dirt road on which we 'trod'* " . . . "We have been using that road as ours from the time I was born" . . . it runs through Zayas Pizarro's property "but straight up" . . . if that road were closed, he would have no other exit to the public highway . . . "we will never give up that road, we will never give it up" . . . he has seen *cars, automobiles "of the kind that use gasoline"* . . . "also Mr. Daleccio's big trucks loaded with stone" (Mr. Daleccio's quarry is farther down near the paved road) . . . *cars* drive all the way up to the house . . . the public cars turn on the junction . . . "the cars leave us there, but other *cars* go up to Vicente Zayas Pizarro's house" . . . whenever he has had to transport beds, mattresses, or heavy articles from Juana Díaz to his house, he uses those *public cars*, and at times they have driven him up to Zayas Pizarro's house . . . once a truck owned by Vicente Daleccio went up and "well, it went up once, it went up well and came down well," . . . he does not know the width of the road . . . "a road flat in part *along a small path which may be improved to make the ascent easier and, of course, any other improve-*

*ment without danger*" . . . he does not know how to drive . . . "I do not know, sir, and I do not want to have anything to do with cars" . . . The witness is "about sixty or seventy years old." When he told Zayas Pizarro that he was 97 years old, "that's nothing, I was just joking, I did it just for fun" . . . he remembers that it was "more than two years ago" that a truck went up there to load stone . . . he does not know what a jeep is . . . he does not know whether first or second gear is used to go up, "I do not know because I do not drive a car, but give me mare and I'll lead it straight up and down" . . . when it rains *automobiles* can go uphill and downhill . . . "I have seen *cars* and *trucks* go up there to carry provisions and food to your house . . . every Thursday"; he cannot say what kind of a load they carry, "because I am not the one who carries it; the owners of the stores, the merchants know" . . . he knows that about 100 trucks go up "because from my own house I can see the loaded beasts, the beasts go up four times and they are taken at your house; sometimes they are taken down below (at the junction), but now they are taken at your place" (at the house) . . . the groceries are carried by truck up to the house and from there on by the beasts . . . he knows it because he sees the beasts after they are loaded. "I see them with my own eyes . . . when they go past my house." Every Thursday trucks go up with provisions. (José Dolores Santiago, Tr. 321–37.)

The seventh witness called by the defendants-appellees was Tomás Santiago, who testified as to the present condition of the existing public road as follows: The trucks may turn at the house . . . the place is not "very wide, but the trucks turn there" . . . the neighbors of Barrio Cuevas go down to town "on horseback as far as the house . . . of Vicente Zayas Pizarro . . . and from there they take a bus, truck, or pickup which comes to take and leave passengers . . . the trucks come "with provisions from two neighborhood stores" . . . "*almost every day* a truck *goes up there*" . . . he does not know how many hundredweights they carry . . . "sometimes

they go up the hill" when it rains . . . "Daleccio drove up last Tuesday and it was raining" . . . he does not know the grade or the width of that road . . . *there is not enough room for two trucks on that road* . . . there is room at a time for a mare with baskets, a horse, and also a truck . . . when Zayas Pizarro planted sugar cane, he saw a truck loaded with cane coming down; "it went up empty and came down loaded, and when it carries the seeds it came down loaded" . . . "almost loaded" . . . not quite up to the railing. (Tomás Santiago, Tr. 337–51.)

The eighth witness called by the defendants-appellees was the *agronomist,* Pelayo Vals, who testified as to the present condition of the existing public road as follows: "About 5 kilometers of the road is paved, *and from there on* it is a dirt road, an unpaved horse trail about 4 or 5 meters wide at some places, *flat in part, and having two grades as far as the house* located on the boundary of Zayas Pizarro . . . that the road *could be* improved for the traffic of heavy-motor vehicles . . . trucks loaded with marblestone *could* drive downhill . . . it could be used by private motor vehicles . . . "without any difficulty in the dry season, *maybe with some difficulty and care when the weather is damp*" . . . upon reaching Zayas Pizarro's property "the road goes over the ridge" . . . the road, "as laid out by time immemorial, or by the traffic, or by the effect of traffic, *or by erosion,* is well-cut and goes directly to the house of Vicente Zayas Pizarro" . . . "it is an extension of the road" . . . "it is about 300 meters long . . . it has an approximate grade of 16 . . . (16 percent) . . . I can go up in a car on second or first gear "depending on whether the road is wet" . . . "may be not in rainy weather" . . . everything is found there, loose stone and loose soil. (Vals, Tr. 351–71.)

The ninth witness called by the defendants-appellees was Vicente Daleccio, one of the defendants-appellees, who testified as to the present condition of the existing public road as follows: "The road is fairly good" . . . "jeeps, pickups, passenger cars, and trucks *can* travel along that road" . . . he

has seen passenger cars going up there "sometimes to deliver groceries and other times to leave passengers." (Daleccio, Tr. 371–73.)

After hearing these testimonies, the presiding judge, accompanied by the parties and their counsel and by the officers of the court intervening in this kind of proceeding, inspected the premises. From the minutes of inspection we extract the following statements as to the present condition of the existing public road: "When we arrived at Las Cuevas road, we measured the width of the dirt road, which is 3 meters and 60 centimeters, and there is only a ditch 20 inches wide; 125 meters ahead we again measured the width of the road, where there are no ditches, and from fence to fence it is 3 meters and 75 centimeters wide; the fence is on the left side at the edge of the road and at the lower part of the slope; about 150 meters away the width of the road is 5 meters and 70 centimeters; approximately 200 or 250 meters from the Naranjo highway the road is 4 meters and 10 centimeters wide; on the boundary line between plaintiff's land and defendants', on a dirt road, at a distance of 9 meters from the house, the road is approximately 5 meters and 10 centimeters wide, excluding the ditches" . . . (Judgment Roll 18–19); "let it be recorded that at the point where we stand, and which Zayas Pizarro has testified that he does not know whether or not it is part of his property, there are no wires, fence, or palisade of any kind dividing the land owned by Zayas Pizarro from the road; on the contrary, there is a fence between the land of the Heirs of Daleccio and the road; upon reaching this piece of land (house) we find two dump trucks, a Ford and a Dodge; one of them is loaded with a cubic meter of telford stone; there is a wire fence and a thicket of briers and brambles; the fences continue along the left side, and on the left there are the lands of Zayas Pizarro and to the right those of the defendants, we keep walking on the road; when measured, the complete road is 290 meters long . . . we reach a small valley *after descending a mountain* and notice some

very large rocks at the site where the quarry would be located, and notice also that everything there is surrounded by trees, underbrush, and guinea grass . . . that there are no roads on plaintiff's property, but only lanes, footpaths, and horse trails, and that those pathways run through the property, *which is broken and mountainous, with a small valley in the center*, near the quarry, with the exception of the pathway up above which leads from the insular highway to the house occupied by a squatter of Zayas Pizarro, which is located on his property . . ." (Judgment Roll 19–21). The rest of the transcript, which has to do with the practicability, safety, and feasibility of repairing the public road, must be copied literally instead of in the usual narrative form, as the dialogue took place:

"From your inspection of the old road, that of Las Cuevas, what is the approximate grade at the highest points?

Mr. Nazario: Approximately 15 or 16 per cent.

What is the approximate grade line along the route you traveled on Daleccio's land?

Eight percent.

Lic. Colón: Let it be recorded that the defendant does not admit the expert's conclusions.

Judge: This road having an approximate grade of 16 percent, is it susceptible of repairs and improvement?

Mr. Nazario: Yes, sir.

From your experience (your capacity as an expert engineer has been accepted), what would be the approximate difference, if any, between the cost of repairing and enlarging that road so as to make it more serviceable for heavy-and light-motor vehicles and the construction of the road requested?

Mr. Nazario: Indeed, that's difficult question. We would have to make an estimate. There might be another possibility, that the land be softer in other places.

Judge: Based on the distance traveled, make an approximate estimate, if possible.

Zayas Pizarro: I believe the question is improper, because the greater or lesser investment on the new road is not in issue here, and it is an expense that I would bear, regardless of the amount, since it would be exclusively for my own use.

Judge: Could you answer my question?

Mr. Nazario: It would be hard.

Lic. Zayas Pizarro: To make it trafficable, without any asphalt or stone pavement.

Judge: Nothing has been said about stone pavement. To make it trafficable for heavy—and light—motor vehicles.

Mr. Nazario: It is difficult because it would be necessary to make two or three studies, or to construct it higher up if softer ground is found.

Lic. Colón: I object because it would have to be confined to the road traveled by us.

Mr. Nazario: It would be necessary to make several studies, and we cannot say with certainty at this time how much it would be.

Judge: The question is more or less the same. What would be more expensive, to repair this road or to construct a new one?

Mr. Nazario: That's difficult.

Judge: We wish to state that on part of the road traveled by us there are no stones on Daleccio's property, and also that there is a ravine.

Judge: Any other question to Mr. Nazario?

Lic. Hernández Matos: Your Honor, we would like to know if by improving that road of Las Cuevas as best as possible, even paving it with concrete, if it would be a safe and practicable roadway as respects the site where the quarry is to be exploited.

Judge: That would be a matter of testimony. Please answer.

Mr. Nazario: It could be repaired.

Lic. Colón: Practicable to reach plaintiff's property.

Mr. Nazario: Up to the house.

Judge: The court does not admit the last question concerning the expenses because we are not at the trial.

Lic. Zayas Pizarro: We take exception.

Judge: Besides, the witness has said that he cannot assess the cost of repairs. We now ask Mr. Daleccio, what is the question?

Lic. Colón: The question to witness Daleccio, as a defendant, is whether he believes if the expense of building the road in question would be greater or less than repairing the existing road.

Judge: Question overruled, because we are making a personal inspection for the purpose of making notes. Please bear

in mind that the expert, who is an engineer, was asked to state his conclusions and that he was unable to make any estimates. At this moment the plaintiff asks that the truck, which carries approximately one cubic meter of telford stone, go up to a certain point, stop, and then go up again.

Lic. Colón: But not loaded.

Judge: The court orders it to go up.

Lic. Zayas Pizarro: I object to having it go up at full speed.

Judge: It should go up as directed, and as to which the defendant acquiesced at the beginning.

Lic. Zayas Pizarro: I withdraw, because no instructions to stop were given.

Judge: The court gave the pertinent instruction. If you withdraw, please say so. The court ordered the truck to go up 100 meters and to stop.

Lic. Zayas Pizarro: We insist on the question.

Lic. Colón: The defendant acquiesces, although I believe it is logical. Let it be recorded that the Ford truck has stopped at one of the steepest points, and that the judge has seen it personally; that it came to a full stop and has just gone uphill.

Judge: That first truck was empty. Let it be recorded that the Dodge truck, a 1939 model, stopped at the same place as the other, loaded with a cubic meter of telford stone, and went uphill more easily than the empty truck.

Let it be recorded that our observation is that the ground is completely dry; so are the pastures and brambles of both properties.

No suggestion has been made to the court to ask any other question. It is one o'clock in the afternoon. Then the inspection has ended . . . ." (Judgment Roll 22–27.)

After receiving the foregoing testimony and making the aforesaid inspection, the trial court concluded: "That although the road is unpaved, *it can be enlarged and improved . . . that, despite its present condition,* heavy-motor vehicles, loaded or unloaded, may travel on the road . . . that it would be advisable *to enlarge the road,* paving it with stone or asphalt, and with the proper conservation the damaging effect of rain could be prevented . . . *that, despite its present condition,* the road is safe for travel, taking, of course, the

precautions required *on rough land and a narrow road . . . that since the existing road* which joins the insular Naranjo highway to plaintiff's property *can be improved and repaired,* and since a road connecting the stone deposits with the road that leads from plaintiff's property to the highway can be built, *even though at an excessive cost*—it appears from the rest of the evidence—the right of way prayed for should not be granted."

It may be noted that the trial court actually concludes, as to its practicability, that the road in question is narrow and may be enlarged; as to its safety, that the same is fit for travel if the necessary precautions on rough land are observed; and as to its sufficiency for the better development of the tenement requesting the servitude, that it is subject to the condition that the existing road be repaired. To what extent is this conclusion sufficient to defeat plaintiff-appellant's right, will be better understood after expounding the juridical theory of the right of way.

The law in point here is § 500 of the Civil Code of Puerto Rico, 1930 ed., which insofar as pertinent provides: "The owner of a tenement or property surrounded by others belonging to several owners, and having no exit to the public highways, has the right to demand the right of way through the neighboring tenements on paying the proper indemnity."

Commenting § 564 of the Spanish Civil Code, counterpart of our § 500, Manresa says: "Isolation, as related to the purpose of the servitude, should not be construed strictly, *but in connection with the need sought to be satisfied,* and which cannot be satisfied for lack of a convenient outlet, in view of the necessity for access to a public road. Such is the inference, particularly from § 566, as we shall presently see [corresponding to § 502, which provides: The width of the right of way shall be *such as to be sufficient for the requirements of the dominant tenement*] .... The right of way may be claimed when the dominant tenement is surrounded by others belonging to third persons and is without exit to a

public highway. That is as far as the text goes. But the text demands a number of explanations. When shall it be deemed that a tenement has no outlet to a public road? In point of fact, it should be so deemed not only when the tenement has *absolutely* no access whatever, *but also when the outlet is not sufficiently secure and feasible:* a tenement which abuts on a public road *by an impassible slope or grade* is virtually isolated for the purposes of the easement sought by its owner . . . . The important point is that, in any event, the owner's claim to a servitude of right of way must be based on an immediate rather than a future need. The forced, impositional, and legal nature of the right of way excludes the right of the owner of an isolated tenement to claim it: 1—when the isolation was the action of his own will—an owner who isolates his tenement from the road by erecting constructions of any kind—and 2—for sheer comfort. Comfort cannot be included in the assumption of necessity to which the Code expressly refers . . . . Section 566 refers *to the width of the right of way.* Pursuant to the express provisions of the Code, this condition will be determined exclusively in accordance with the interest of the dominant tenement. This is a point on which the lawmaker has radically changed the precedents established in ancient law with respect to the right of way, insofar as its voluntary nature is concerned. We have already said that both the Roman law and the *Partidas* distinguished, *according to the requirements of the dominant tenement,* between three kinds of rights of way. The *Partidas* referred to the right of path *(senda)*—where one may pass on foot, on horseback, alone or with others . . . so that they go in a single file and not side by side—; the right of a carriage way *(carrera)*—where one may pass with carriages . . . —; and the right of way *(vía)*—where one may pass on foot, or on horseback, alone or accompanied, in carriages . . . , or hauling, etc. The Code dispenses with these distinctions and establishes a vague principle, undetermined at first, but which will eventually adapt itself adequa-

tely, keeping in mind *that the servitude will be imposed by the need of the dominant tenement,* a need which also determines its width. And not only this: a strict interpretation of the provisions of § 566 lays down the principle that *the right of way, once it is established, may be modified* according to the needs of the dominant tenement. As Ricci observes, *the right of way having been imposed with a view to the needs of the tenement or property,* there is no remedy but to bear the contingencies and variations of these needs." 4 Manresa, *Comentarios al Código Civil Español* 787–88, 793 (Instituto Editorial Reus, 6th ed., 1951). (Italics and brackets ours.)

Commenting on the same section, Scaevola says: "The other requirement, the main one, is that the property be without an outlet to a public highway. The language of the section leads us to affirm that, in order to impose the servitude, *the tenement must have no exit to a public highway, and that such highway be public.* Is it actually so? Laurent is of the opinion that the right of way should be established not only when there is no exit to a highway, *but also when the latter is insufficient; because, if an owner can use a path only when he needs a road, he must be considered as being in an enclosed tenement,* adding that this has been so established by the French jurisprudence. We also feel inclined to accept this solution. *If the basis for the right of way is the need of the dominant tenement,* the determination, the materialization of the right *must be subordinated to the necessity.* If the dominant tenement *demands a thoroughfare that is wider than the public highway, it may demand another because the former might as well not exist . . . .* For this same reason it will be lawful to demand the right of way *whenever there is a road,* and such road has been destroyed or rendered useless by floods, erosion, etc. There is no road, and it is necessary to establish a temporary outlet, that is, while the one destroyed is being repaired." 10 Scaevola, *Código Civil* 581–82 (Instituto Editorial Reus, 5th ed., 1947.) (Italics ours.)

On this same question, Castán comments as follows: "Pursuant to § 564 of the Civil Code, the *forced servitude of right of way* may be defined as the right granted to the owner of a tenement or property, surrounded by others belonging to several owners and having no exit to a public highway, to demand the right of way through the neighboring tenements upon payment of proper indemnity. Although the law speaks only of the owner, the textwriters believe that any person who by virtue of a real-property right can cultivate and use an estate, such as the usufructuary, the usuary, or the emphyteuta, may seek to establish this servitude. Requirements for the granting thereof . . . : 1—That the property be surrounded by other properties belonging to different owners and having no exit to a public highway. Despite the conclusive terms of § 564 [our § 500], the textwriters (Sánchez Román, De Diego, Manresa, etc.) believe *that it is not necessary that there be no outlet to a public road*, but that it will suffice *if the existing outlet is difficult, hazardous*, or insufficient . . . 2—that the proper indemnity be paid." 2 Castán, *Derecho Civil Español, Común y Foral* 524–25 (Instituto Editorial Reus, 7th ed., 1950). (Italics and brackets ours.)

On this same question, Sánchez Román says: "Since the creation of this right of way depends on the specific condition that the tenement be surrounded by others and that it have no exit to a public highway, the question may arise as to whether this condition is to be interpreted as being absolute or only relative; in other words, if it is essential that there be no exit, long or short, sufficient or insufficient, convenient or inconvenient, easy or difficult, by land or by water, and that the lack of exit, whatever it be, be imputable or not to the owner who seeks the establishment of a right of way on another's property in order to connect his own with a public highway. We believe that the spirit of the Code is to consider, in such event, as reasonable causes for the establishment of the servitude: 1—When there is actually no outlet to a public road; 2—When the existing outlet *is difficult or*

*hazardous* because it is fluviatic, or, *if terrestrial*, it is *manifestly insufficient* for the cultivation of the tenement, for in these two cases the fact that the road is *hazardous, impractical*, or *insufficient* is tantamount as if it were nonexistent. These cases differ from the hypothesis of the existence of an outlet, even though it is uncomfortable or long, which circumstances are sufficient to preclude the right to demand the establishment of a right of way." 3 Sánchez Román, *Estudios de Derecho Civil* 617–18 (Sucesores de Rivadeneyra, 2d ed., 1891). (Italics ours.)

The general rules established by the Spanish Civil Law, which are the sources of our civil law, are the following: (1) a tenement is deemed to have no access to a public thoroughfare not only when it has absolutely none, but also when, having one, it is not sufficiently secure or practical; (2) *the establishment of a right of way is determined by the needs of the dominant tenement,* and the width of the right of way will be based on the interest (needs of the dominant tenement); (3) the right of way may be modified, once established, as required by the needs of the dominant tenement; once the right of way is granted in keeping with the needs of the dominant tenement, the servitude on the servient tenement must bear the contingencies and variations of these needs; (4) *if the needs of the dominant tenement require a wider thoroughfare than a public road,* it may demand another road because the former is practically nonexistent; (5) the owner of the dominant tenement will have no right to demand a right of way when the isolation of his tenement flows from voluntary acts of the owner, such as obstructing the outlet to the existing road by erecting structures; (6) rights of way must be granted with a view to the needs and a better utilization of the dominant tenement, and not for the owner's convenience; and the need must be actual, that is, immediate, and not future, that is, remote and speculative.

We have examined the recent cases decided by this Court —*Nin* v. *Rucalleda et al.,* 28 P.R.R. 503 (Hutchison, 1920);

*Toa Sugar Company* v. *Galán et al.*, 28 P.R.R. 791 (Hutchison, 1920); *Miner* v. *Irizarry*, 52 P.R.R. 197 (Del Toro, 1937); *Tirado* v. *Caro*, 72 P.R.R. 698 (Todd, hijo, 1951); *Román* v. *Jiménez*, 76 P.R.R. 532 (Sifre, 1954), and none of them is applicable here. These cases sanction the general principle of the Spanish doctrine that a tenement is deemed to have no access to a public thoroughfare not only when it has absolutely none, but also when the outlet is not sufficiently secure or practical; however, none of those cases has dealt with the lack of accessibility of the existing road or its insufficiency for the better utilization of the dominant tenement.

■ The granting of a right of way is always an excellent opportunity for the practical application of the juridical concept of reasonableness. The question to be carefully weighed is whether the petition is groundless, inspired on the sheer convenience of the petitioner, or whether it is based on the need or on the better utilization of the tenement. It is well known that in granting a right of way the persons interested therein must be excluded, for above the individual concern of both the owner of the dominant tenement and the owner of the servient tenement, which is always a transitory, temporary concern, lies the philosophy of public economy concerning the greater productivity of the tenements—*Nin* v. *Rucalleda et al.*, *supra*, at p. 508—and likewise the characteristic spirit of the common good, the economic interest of the State which does not favor the perpetuation of uncultivated lands, a declaration of public law which is not inconsistent with the best civilian conception, for it is likewise known that our Civil Code contains not only elements of private law, of a strictly civil nature, but also elements of public law. See Antonio Hernández Gil, *El Concepto del Derecho Civil* 17 *et seq.* (edited by Revista de Derecho Privado, 1943). As Scaevola very accurately points out: "The right of way is imperative and the modern codes so recognize it, for, as stated by Albissom, the cultivation and exploitation of an enclosed tenement, without an outlet to a public road, would

be impossible if the law did not open for the owner, on the surrounding tenements, *a passage proportionate to its needs;* and the general interest—says Berlier—discourages tenements located beyond the dominion of man or which are unproductive because, in order to reach them, one must go across neighboring tenements." 10 Scaevola, *op. cit.* 571. For this same reason, Manresa observes, commenting Ricci's opinion, as already noted, that rights of way must not be static, but should evolve in keeping with the varying needs of the tenement.

Thus, in granting a servitude there is always a natural principle to be observed, irrespective of the fact objectified through theory, and such observation requires a total abstraction of any other interest not beneficial to the tenement itself, for this is the conciliatory point between private and public interest. What may be convenient or inconvenient for the normal exploitation of the tenement or for its transformation into a better use of its wealth, is the real matter of importance, and, hence, of juridical interest. If the petition is based on a reasonable need which may serve as a projection of the right to dispose of a private property for the benefit of the common good, it should be granted. If the petition is based on sheer convenience, for which the owner of the dominant tenement could be held responsible by his own action, it should be denied, for, as pointed out by Puig Peña: "Here is where the *civiliter* act is more properly found, rooted perhaps in the theory of the abuse of the law, which prevents the exercise of our own faculty *when, without yielding a personal benefit, it causes injury* to another." III-I Puig Peña, *Tratado de Derecho Civil Español* 402. (Last italics ours.)

From the juridical theory expounded it appears that the concepts of "practical," "secure," and "sufficient," although at times illustrated with some examples to serve as index to the analogical principle, are neither defined nor limited, and, therefore, the trier is at liberty to apply them within the wide

range of circumstances that may arise in any specific case. However, he may not do so arbitrarily, but in keeping both with the philosophy of the institution of law and the rules of individual interpretation.

■ In the ordinary sense of the term, a practical road is not one having a certain degree of accessibility, but of common and ordinary trafficability. In this case the evidence of the experts (Giles, Tr. 53; Nazario, Tr. 153–54; Vals, Tr. 362) established that, according to the general standards of the Government of Puerto Rico, the normal grade of a road must not exceed 7 or 8 per cent (7 or 8 meters of elevation per 100 meters), a test which must be adopted since this is not the case of a legal servitude of a private nature, but of a road for public use. It is obvious that a road with a grade of 16 to 20 per cent is not practical. Act No. 8 of May 16, 1919 (Sess. Laws, p. 110), "establishing the width of insular and *municipal roads*," provides "That third-class and *municipal roads* shall have as a limit a width of not less than five meters, plus the necessary additional width in each case for road gutters in a strip of land one meter in width measuring from the outside edge of the slope," a rule which must be observed, since, as already pointed out, the servitude in question is not a legal right of way of a private nature but a road devoted to public use. It is obvious that a road, the full length of which is 290 meters, as measured by the presiding judge himself, of which 125 meters is 3 meters and 75 centimeters wide (Judgment Roll 18), is not a practical road for the heavy traffic of modern times.

■ In the ordinary sense of the term, a safe road is not one where extraordinary precautions must be taken, but one which is ordinarily and easily trafficable. The expert for the defendants-appellees describes it as follows: "It is an unpaved dirt road or horse trail, about 4 or 5 meters wide at some places, *partly flat, with two grades* as far as the house located on the boundary of Zayas Pizarro" (Vals, Tr. 352) .... "The road, as laid out by time immemorial, *or by*

*the traffic,* or by erosion, is well-cut and goes directly to the house of Vicente Zayas Pizarro." (Vals, Tr. 357.) This description is not so antithetic and irreconciliable with the version of Giles, the expert for plaintiff-appellant, who describes it thus: *"Like all dirt roads which run through mountains* and which are cut precisely by the action of traffic and of rain, and perhaps by shovel and pickaxe, it is a very steep road" (Giles, Tr. 37–38) . . . "a dirt road with many grades, a poor and inconvenient surface" (Giles, Tr. 49) ; . . . "it is clay and loose stone" (Giles, Tr. 50) . . . "To make it clearer, in several sections the road is sort of a ditch" (Giles, Tr. 50) ; . . . or with the version of another expert, Mr. Nazario, who describes it as follows: ". . . a horse trail of loose stone, with no ditch, of some gravel and also loose stone . . . it is about 4 meters wide . . . from fence to fence . . . with rather steep grades." (Nazario, Tr. 140.) The topographic map of the Government of Puerto Rico shows that from the junction at the road up to plaintiff-appellant's house, where the road ends—since from there on one must travel on horse-back—according to the testimony of defendants' witnesses themselves, the road rises from 250 meters to 400 meters above sea level on a stretch of less than 300 meters. If on that stretch of 300 meters some of the land is flat and there are grades, according to the testimony of Mr. Vals, those grades, if the soil is loose, undoubtedly constitute a difficult and hazardous passage for any kind of heavy traffic.

However, from the findings of fact it appears that it was not the intention of the trial court to declare conclusively that the road was practical and safe, but rather that, since it can be repaired, it could be rendered practical and safe after repairs were made by the plaintiff-appellant. The trial court's error consisted in regarding the case as one of a legal private servitude, and as such governed by § 479 of our Civil Code, which provides that "The owner of the dominant tenement may make, at his own expense, on the

servient tenement, all works necessary for the use and *preservation* of the servitude, but without altering it or rendering it more onerous," instead of regarding it as one of access to a public road, pursuant to § 256 of the Civil Code of Puerto Rico. That road belongs to the municipality of Juana Díaz, and it was incumbent on the Municipal Council to take some action to make a new survey, a new layout, reconstruction, improvement, or reinforcement of the road, pursuant to §§ 65, 66, and 67 of the Municipal Law of Puerto Rico and the provisions of Act No. 8 of May 16, 1919. Not only is plaintiff-appellant not bound to repair that road, but he has no authority to undertake its enlargement or improvement to render it practical and safe. This being the situation, in order to settle the issue raised by the parties, the trial court should have taken into account the right of the plaintiff-appellant to demand the right of way, in view of the present condition of the road, and to state clearly and specifically whether it regarded the road, such as it is now, practical and safe and also sufficient to meet the needs of the tenement.

What is meant by a sufficient road *in connection with the needs of the tenement*, a situation altogether different from the mere necessity of access to a public road, without considering the agricultural or industrial exploitation of the tenement, is better defined by the French commentators, thanks to the provisions of § 682 of the Code Napoleon, which reads: "The owner whose tenements are enclosed by others and have no access to a public road, *or the access is insufficient for the agricultural or industrial exploitation* of his property, is entitled to demand a right of way thorugh the neighboring tenements by paying an indemnity proportionate to the prejudice that he may cause them." Code Napoleon, p. 172 (edited by Juan Buxó, Havana, 1921). This aspect of the French theory, in everything concerning the needs of the tenement, is to a certain extent interchangeable with the Spanish theory pursuant to § 566 of the Spanish Civil Code, equivalent to

§ 502 of our Civil Code, which provides: *"The width* of the right of way *shall be such as to be sufficient for the requirements of the dominant estate."*

Regarding the requirements necessary for the agricultural or industrial exploitation of the dominant tenement, Planiol y Ripert states: "The right of way is granted by law with a view to the exploitation of the tenement; *its existence as well as its extension are subordinate to the needs of the exploitation,* but it must be construed in very broad terms. As expressly provided by the new § 682, which consecrates on this point the former jurisprudence, *the industrial exploitation must be taken into account simultaneously with the agricultural exploitation.* Thus, the owner may claim the right of way *for the exploitation of a quarry,* a turbary, a glacier, or an establishment, as well as for the cultivation of the land. *One must go still further.* The owner of an enclosed tenement is free to exploit it as he sees fit, adding such innovations as he may deem useful, enlarging, for example, his industrial establishment, *and may therefore claim a new passage if the original one proves insufficient. He may even change completely the method of exploitation of his tenement by opening, for example, a quarry on land formerly devoted to cultivation,* or by erecting a building or an industrial establishment; *to satisfy the needs of the new exploitation, he is entitled to claim the right of way which he may consider necessary . . . ."* 3 Planiol y Ripert, *Tratado Práctico de Derecho Civil Francés* 773, § 928 (Cultural S. A., Havana, 1942 ed.).

Even if the existing public road were practical and safe, it must also be sufficient for a better utilization of the tenement (Spanish theory), or for its agricultural or industrial exploitation (French theory). If the public road proves to be practical and safe but insufficient for a better utilization of the tenement, the right of way must be granted.

The evidence in this case established that the plaintiff-appellant undertook the planting of sugar cane on the only

portion of the property fit for cultivation, consisting of a small valley located in the center between two stone mountains which cover practically the entire northern and southern parts of his property, and that he had to desist from the cultivation because of the transportation difficulties on the existing public road (Vicente Zayas Pizarro, Tr. 255-57); that shortly before he undertook to repair the road, "but the first heavy rains washed away the work I had done on that small stretch of 300 meters extending as far as the house" (Vicente Zayas Pizarro, Tr. 256); that of the 81 and odd cuerdas of land, "only about 15 or 20 cuerdas are tillable because the rest is a rocky mountain" (Vicente Zayas Pizarro, Tr. 258-59). Regarding the amount of stone, "it is inexhaustible, there is enough stone for a ten-year supply for the entire Puerto Rican market, and there would still be stone left." (Vicente Zayas Pizarro, Tr. 263.)

The need to lay out the right of way requested on the southwestern section is also clearly established by the evidence. According to the testimony of Juan Pibernus, whose capacity as an expert in the quarry industry is accepted by both parties, "the existing road which leads to the farm has access to the top of the quarry but not to the base, where the work is done"; that the quarry must be worked from the base up because "it is necessary to gain altitude in order to make it profitable"; "that the stone wall must be high enough in order to start at the base upward, and the upper part falls as a result of the work done down below . . . otherwise the quarry would have to be worked one stone at a time" . . . and it would be "very costly"; that "the higher the wall the more profitable for the one working the quarry"; that is why it is said that the quarry "must be worked from the base up," that is, "at the base of the quarry where the land is flattest" (Juan Pibernus, Tr. 194-95); that "if a road should lead to the lower part of the quarry, it would be an excellent quarry" (Juan Pibernus, Tr. 107). The topographic map which is part of the evidence shows that across the existing public

road which runs alongside the southeastern part of plaintiff-appellant's property, there is a solid stone block 400 meters above sea level; that the semiflat section is on the opposite southwestern point where, according to the expert, it would be necessary to start the work on the quarry.

The solution found by the trial court to this imposing natural obstacle was the construction of a road joining the mouth of the quarry to the existing public road. The error of the trial court consisted in believing that that public road constituted a private right of way because of the fact that it bordered the defendants-appellees' property, and, hence, that the expense of building an interior road on the dominant tenement, to join it to the existing right of way, would have to be borne by the plaintiff-appellant, even if the cost was exorbitant, because it was necessary for the *construction* and conservation of the legal private right of way, pursuant to § 479 of our Civil Code. There is nothing in the evidence indicative of the fact that the public road was, at any time or at the date the action was brought, a legal servitude imposed on the defendants-appellees' property in favor of plaintiff-appellant's property. Incidentally, the evidence for the defendants-appellees establishes beyond any doubt that we are dealing with a public road, a jointly owned property, rather than with a legal servitude of a private character for the benefit of a single tenement. The fact that a public road runs across a tenement does not mean that a legal servitude of a private character is established on such tenement, for the road is never part of the physical body of the tenement. The plan of the property of the plaintiff and appellant, drawn up prior to this suit, shows the layout of a dirt road as a piece of property separate and apart from that of defendants-appellees.

Servitudes are granted with a view to meeting the needs and to the better use of the tenement, without regard to other elements of judgment. Sometimes the intracommunication of the tenement or its possible connection to a practical and

safe road, at a convenient point within the property, involving no hardship or sacrifice for the dominant tenement, brings about a legal situation in which it may be determined that the servitude sought is not a need but a convenience for the dominant tenement. But such is not the case here. The trial court itself admits the necessity of starting to work on the quarry from the southwest, holding, in support of the denial of the servitude, that a road may be laid out along the southern boundary in order to render the stone deposits useful.

The case before us is one, therefore, in which the necessity for the better utilization of the tenement has been established, and not a case of mere convenience. Once the conclusion is reached that the servitude in question is necessary for a higher productivity of the tenement, and since servitudes are granted originally, or modified, according to the needs or transformations required for the better utilization of the tenement, the courts are bound to grant the servitude. The court may mitigate and, in any event, compensate in the exterior layout of the servitude and in the amount of compensation, any damages which the servient tenement may suffer.

After a careful examination of the findings of fact made by the trial court, it is clear that the judge believed in good faith that the juridical facts of this case were similar to the facts involved in the judgment of March 13, 1901 of the Supreme Court of Spain—91 *Jurisprudencia Civil* 338 (Imprenta de la Revista de Legislación, 1901 ed.).

In order to understand more fully why the Spanish case does not apply to the facts of the instant case, let us turn to the facts actually considered (*considerandos*) by the Supreme Court of Spain: "*Whereas*, pursuant to the provisions of § 564 of the Civil Code [§ 500 of our Code] the owner of a property surrounded by others belonging to different owners has the right to demand a right of way through the neighboring properties only when his property has no access to a public road, it being therefore evident *that an owner who has estab-*

*lished a right of way in favor of his tenement has no such right,* even if his servitude has reparable defects which hinder or render traffic impossible, *particularly if such defects are present, not only in the layout of the servitude, but also on the roadway built by the owner within his property to join it to the servitude,* since there is no question that under such circumstances the enclosed tenement is not without an outlet, it being sufficient for the restoration of the full enjoyment of the existing easement that the owner of the dominant tenement *repair the defects, if any, or change the layout if the defects occur within the same tenement,* in which case both encumbrances affect the owner himself and not his neighbors, who are merely bound to grant a right of way where there is none. *Whereas,* in such event the first two grounds of the proceeding are untenable, since the dismissal of the complaint is based not only on the fact that Vicenta Peláez may and does utilize a railway and a passage over the Jarama River for the exploitation of her property, which indeed would not accomplish the purposes of § 564, but also, and particularly, *on the uncontrovertible fact that a right of way* for pedestrians, carts, and cattle *has existed from time immemorial on defendant's tenement in favor of Doña Vicenta's;* and although it is true that the existing passage is deficient on account of the floods of the Jarama River, *such defective passage is situated within the dominant tenement and is also susceptible of repairs in the opinion of the trial court."*

It will be noted that the legal servitude involved in the Spanish case was a private one, and the Supreme Court merely applied § 543 of the Civil Code (§ 479 of our Code), which provides that "The owner of the dominant estate may do, at his own expense, on the servient estate, *any work necessary* for the use and preservation [repair] of the easement, *but without changing it or rendering it more onerous."* We are not concerned in this case with a legal servitude of a private nature, but with a tenement with access to a public

road, in which it is alleged that the public road is not practical and safe, and, furthermore, that it is insufficient for the industrial utilization of the tenement.

For the foregoing reasons, we conclude that, (1) assuming that the public dirt road which extends from the junction of the public road to the southeastern corner of plaintiff-appellant's property were practical and safe, such road could not be used for the industrial exploitation of plaintiff-appellant's property because there is a rocky mountain 400 meters above sea level which renders the road inaccessible for a better utilization of the tenement, which is the purpose of an ordinary predial servitude; (2) assuming that the existing public dirt road, in its present condition, is not practical and safe but could be converted into one after it is repaired, the plaintiff-appellant should not bear the cost of the repairs, nor would he have authority to make them, since § 479 of the Civil Code of Puerto Rico is not applicable to that state of law, but only applies to legal servitudes of a private nature; (3) considering the needs of the dominant tenement alone, the most practical and safest road and which would also be sufficient for the industrial exploitation of the dominant tenement, would be the new servitude requested which would join the mouth of the quarry directly to a public road.

Despite the existence of the public road, defendants-appellees' property is, as a matter of fact, not only an enclosed tenement, because of its condition, for the industrial exploitation of its resources, but also it has been improductive for over a quarter of a century. It is a proved fact that both parties took steps to obtain the construction of the insular road which goes as far as the defendants-appellees' property but is 300 meters short of plaintiff-appellant's property, with the understanding that plaintiff-appellant would be given an adequate right of way through defendants-appellees' property if the new road did not extend as far as plaintiff-appellant's

190

tenement. If the law is to be fairly applied in our times, this servitude should be granted.

Our previous judgment of May 14, 1953, as well as our order of December 12, 1955, will be reversed and the servitude requested by the plaintiff-appellant granted after the proper indemnity is assessed by the Ponce Part of the Superior Court of Puerto Rico.

Mr. Justice Negrón Fernández and Mr. Justice Pérez Pimentel dissented.